UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RENDAE DIATEZ WEST,

                Petitioner,                        Hon. Janet T. Neff

v.                                              Case No. 1:10-CV-1296

CARMEN PALMER,

                Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on West's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that West's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on July 8, 2007, Petitioner was charged with murder, assault with the intent to commit murder, and two counts of possessing a firearm during the commission of a felony.  (Trial Transcript, February 20, 2008, 8-9, 27-28).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

1

**Thosha Suggs**

Suggs is Tim Palmer's mother.  (Trial Transcript, February 21, 2008, 186).  In the early morning hours of July 8, 2007, Suggs was summoned to the hospital where her son was being treated for gunshot injuries.  (Tr. 187-89).  Tim Palmer died "a couple of days later."  (Tr. 189).  Suggs related that her son had recently been graduated from high school where he had participated in wrestling for many years.  (Tr. 189).  Palmer was planning to attend college where he hoped to continue his wrestling career.  (Tr. 189-90).

**Sarah Kuhl**

As of July 8, 2007, Kuhl resided at 1030 Stockbridge.  (Trial Transcript, February 21, 2008, 191-94).  At approximately 2:00 a.m. that morning, Kuhl heard somebody "pounding" on the door to her apartment.  (Tr. 194-96).  Kuhl answered the door and ran downstairs where she observed Tim Palmer sitting in a vehicle with a gunshot wound to the head.  (Tr. 196-99).  Kuhl immediately entered the vehicle, a silver Grand Am, and began driving to a hospital.  (Tr. 198-99).  Before arriving at a hospital, Kuhl stopped to allow Palmer to be treated and transported by emergency personnel.  (Tr. 199-202).

**Curtis Bonnema**

As of July 8, 2007, Bonnema was employed as an Officer with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 204).  At approximately 2:18 a.m. that morning, Officer Bonnema was dispatched to the 1300 block of Stockbridge to investigate possible gunfire.  (Tr. 205).  After arriving at that location and discovering nothing of note, Bonnema

2

proceeded to a nearby hospital. (Tr. 205). Before arriving at the hospital, however, Officer Bonnema observed a silver Grand Am in a parking lot surrounded by two ambulances. (Tr. 205-06). When he approached the Grand Am, Officer Bonnema observed a black male in the front passenger seat "with a bullet through his head." (Tr. 206).

**Steven Whyte**

In the early morning hours of July 8, 2007, Whyte was riding in a silver Grand Am driven by Anthony Morgan. (Trial Transcript, February 21, 2008, 208-09). Brian Sanders, Kristopher Woodson, and Tim Palmer were also passengers in the vehicle. (Tr. 209). After driving around town for some time, the group stopped at Petitioner's house. (Tr. 222-30, 239). Petitioner immediately approached Morgan's vehicle and initiated a confrontation with Whyte. (Tr. 230-34). After a brief exchange of words, Petitioner brandished a firearm and threatened to shoot Whyte. (Tr. 230-32). Before the confrontation escalated any further, however, Whyte reentered Morgan's vehicle and the group drove away. (Tr. 230-33).

After leaving this encounter, Whyte was seated directly behind Morgan. (Tr. 209). Brian Sanders and Kristopher Woodson were also sitting in the back seat. (Tr. 209). Tim Palmer was sitting in the front passenger seat. (Tr. 209). At some point, Morgan stopped at the intersection of Portage and Stockbridge. (Tr. 210-13). While Morgan was waiting for the traffic light to turn green, Whyte "seen a spark" and immediately realized that "somebody's shooting." (Tr. 214, 237). Whyte recognized the vehicle from which the shot originated as belonging to Tyres Sykes. (Tr. 238). Whyte saw two shots fired from the driver's side rear seat of Sykes' vehicle. (Tr. 238). After Sykes' vehicle drove past, Whyte observed that Tim Palmer had been shot. (Tr. 214, 237-38). Morgan

3

continued driving a short distance down an alley and then stopped his vehicle and ran to get help. (Tr. 214-17). When the person Morgan summoned arrived, she "hopped in the car" to drive Palmer to the hospital. (Tr. 218).

**Anthony Morgan**

In the early morning hours of July 8, 2007, Morgan was driving his girlfriend's Grand Am. (Trial Transcript, February 21, 2008, 257). Steven Whyte, Brian Sanders, Kristopher Woodson, and Tim Palmer were passengers in the vehicle. (Tr. 257-58). After driving around town for a while, Morgan stopped at Petitioner's residence. (Tr. 262-66). Immediately thereafter, Petitioner and Steven Whyte "got into a[n] altercation outside the car." (Tr. 267). Petitioner then pointed a gun at Whyte and threatened to kill him. (Tr. 267-68). Before Petitioner could act on this threat, Tyres Sykes and others "grabb[ed]" Petitioner and told him "to chill out." (Tr. 267). Whyte then "hopped in" Morgan's vehicle and Morgan drove away. (Tr. 267-68).

Shortly thereafter, Morgan stopped at the intersection of Portage and Stockbridge. (Tr. 258). While Morgan was stopped at the intersection, Tyres Sykes' vehicle approached Morgan's vehicle at which point two shots were fired. (Tr. 258-59). The shots were fired from the back seat of Sykes' vehicle. (Tr. 260). One shot struck Tim Palmer in the head. (Tr. 259-60). Morgan was also struck in the eye by a bullet fragment. (Tr. 260). Morgan immediately drove to his cousin's residence where he was assisted by his cousin and Sarah Kuhl. (Tr. 260-62).

4

**Kris Woodson**

In the early morning hours of July 8, 2007, Woodson was riding in a vehicle driven by Anthony Morgan. (Trial Transcript, February 21, 2008, 277-78). Brian Sanders, Steve Whyte, and Tim Palmer were also passengers in the vehicle. (Tr. 277-78). At some point, the group stopped at Petitioner's house after which Petitioner initiated a confrontation with Steve Whyte. (Tr. 283-90). During the encounter, Petitioner "pulled his gun out" at Steve Whyte. (Tr. 286-88). Before the confrontation escalated any further, however, Whyte reentered Morgan's vehicle and the group drove away. (Tr. 287). Soon thereafter, Morgan stopped at the intersection of Portage and Stockbridge. (Tr. 288-89). While the group was sitting at the intersection, Woodson heard two gunshots. (Tr. 278). The shots originated from the back seat of a car which Woodson did not recognize. (Tr. 278-80). One shot struck Tim Palmer in the head. (Tr. 280). Anthony Morgan was also struck by a bullet fragment. (Tr. 281).

**Elijah Roberson**

In the early morning hours of July 8, 2007, Roberson was standing outside of Petitioner's residence, which was located on Ada Street, with Petitioner and Tyres Sykes. (Trial Transcript, February 21, 2008, 300-01). At some point, a silver Grand Am approached Petitioner's residence. (Tr. 302, 309). Petitioner told the driver of this vehicle to get away from his house. (Tr. 302-03). As the Grand Am drove away from Petitioner's residence, shots were fired from the back seat of the Grand Am. (Tr. 303-04). Roberson, Sykes, and Petitioner then jumped in Sykes' car. (Tr. 304-05). Sykes drove, Roberson, sat in the front seat, and Petitioner sat in the back seat. (Tr. 305). Shortly thereafter, Sykes encountered the aforementioned Grand Am, at which point Petitioner

5

fired his gun two or three times.  (Tr. 306-15).

**Brian Sanders**

In the early morning hours of July 8, 2007, Sanders was riding in a silver Grand Am driven by Anthony James Morgan. (Trial Transcript, February 21, 2008, 320).  Kristopher Woodson, Steve Whyte, and Tim Palmer were also passengers in the vehicle.  (Tr. 320).  At some point, the group encountered Petitioner who initiated a confrontation with Steve Whyte. (Tr. 320-27).  During the encounter, Petitioner "pulled a gun out" on Whyte. (Tr. 327).  Whyte reentered Morgan's vehicle and the group drove away.  (Tr. 327-28).  Sometime later, Morgan stopped at the intersection of Portage and Stockbridge.  (Tr. 320-21).  While the group was sitting at the intersection, Sanders heard two gunshots.  (Tr. 321).  The shots originated from Tyres Sykes' vehicle.  (Tr. 321-22).  One shot struck Tim Palmer in the head.  (Tr. 322).  Anthony Morgan was struck in the eye by a bullet fragment.  (Tr. 322).

**Jonathan Galbreath**

As of July 8, 2007, Galbreath was employed as a paramedic.  (Trial Transcript, February 21, 2008, 331-32).  At approximately 2:30 a.m. that morning, Galbreath was sitting in the passenger side of his ambulance when a car approached.  (Tr. 332).  The occupants of the car informed Galbreath that "there was a gunshot victim in the car with them." (Tr. 332).  Galbreath and his partner began treating the victim and transported him to the hospital.  (Tr. 332-33).

**Matthew Brinkman**

As of July 8, 2007, Brinkman was employed as a Sergeant with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 334).  At approximately 2:18 a.m. that morning, Brinkman was dispatched to the area of 1030 Stockbridge to investigate a report of gunfire.  (Tr. 334).  As Brinkman was driving to that location, he learned that Officer Bonnema was with the gunshot victim.  (Tr. 334-35).  Sergeant Brinkman then traveled to Officer Bonnema's location to assist.  (Tr. 335-37).

**Todd Weston**

As of July 8, 2007, Weston was employed as a Sergeant with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 340).  At approximately 2:00 a.m. that morning, Weston was dispatched to the 500 block of Ada Street to investigate a report of gunfire.  (Tr. 340-41).  When Weston arrived at this location "there was nothing going on [and] it was pretty quiet."  (Tr. 340-41).  Sergeant Weston returned to this location the next day, but uncovered no evidence that a firearm had been discharged in the area.  (Tr. 341-42).

**David Ostrander**

As of July 8, 2007, Ostrander was employed as a Lieutenant with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 344).  Early that morning, Ostrander was dispatched to 1030 Stockbridge to investigate a shooting.  (Tr. 344-45).  By the time Ostrander arrived at this location, the victim of the shooting had already been transported to the hospital.  (Tr. 345).

**Jeffrey Johnson**

As of July 8, 2007, Johnson was employed as a Detective with the Kalamazoo Department of Public Safety. (Trial Transcript, February 21, 2008, 349). On that date, Johnson was assigned to investigate a shooting that occurred earlier that day in the area of Stockbridge Street. (Tr. 349-50). As part of his investigation, Lieutenant Johnson initially spoke with Steve Whyte and Anthony Morgan. (Tr. 350-52).

On July 9, 2007, Johnson spoke with Petitioner. (Tr. 353). Petitioner acknowledged that in the early morning hours of July 8, 2007, he was standing outside his residence with Tyres Sykes and Elijah Robertson. (Tr. 354-55). Petitioner indicated that a silver car "pulled up across the street from his house and words were exchanged." (Tr. 354). Petitioner stated that he did not know any of the individuals in the silver car. (Tr. 354). When Petitioner asked the occupants of this car to leave the area, they complied but not without firing shots as they departed. (Tr. 354-55). According to Petitioner, he immediately ran from the area to Jackie Woodward's residence where he remained until the following morning. (Tr. 354-56).

**Jackie Woodward**

Woodward arrived home at approximately 2:15 a.m. on the morning of July 8, 2007, and immediately went to bed. (Trial Transcript, February 21, 2008, 349). When she arose later that morning at approximately 9:00 a.m., Petitioner was asleep on her living room floor. (Tr. 364). Woodward conceded, however, that she did not know what time Petitioner arrived at her residence. (Tr. 364-65).

8

**Charles Dahlinger**

As of July 8, 2007, Dahlinger was employed as a Detective with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 370).  That morning, Dahlinger was assigned to investigate a shooting that occurred earlier that day at the intersection of Stockbridge and Portage streets.  (Tr. 370).  As part of his investigation, Dahlinger discovered two large caliber shell casings near the intersection of Stockbridge and Portage streets.  (Tr. 371-77).

**Tyler Fall**

As of July 8, 2007, Fall was employed as a Forensic Crime Scene Technician with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 21, 2008, 379).  Early that morning, Fall was assigned to investigate the area near the intersection of Stockbridge and Portage streets.  (Tr. 379-80).  Fall examined two shell casings discovered by another officer and determined that they were both fired by a .45 caliber semiautomatic weapon.  (Tr. 383-87).

**Anthony Moore**

Moore met Petitioner when both were housed in the Kalamazoo County Jail.  (Trial Transcript, February 22, 2008, 395-99).  Petitioner told Moore that he was in jail because "he had shot a little boy over there on Portage Road."  (Tr. 395).  Petitioner told Moore that this killing was in retaliation for events that had occurred earlier that day.  (Tr. 395-96).  Petitioner told Moore that he committed the killing while riding in a vehicle with two other people.  (Tr. 396-97).

**Gail Sampsell**

Sampsell testified that she was employed as a Lieutenant with the Kalamazoo Sheriff's Department.  (Trial Transcript, February 22, 2008, 414).  Specifically, Sampsell was responsible for maintaining the jail's prisoner records. (Tr. 414-15).  Sampsell testified that a review of the jail's records revealed that Petitioner and Anthony Moore were housed in adjacent cells for a period of time.  (Tr. 415-17).  Sampsell also testified that Petitioner and Edwin Lockett were housed in the same cell for a period of time.  (Tr. 417-20).

**Charles Hill**

As of August 30, 2007, Hill was employed as a Deputy with the Kalamazoo County Sheriff's Department.  (Trial Transcript, February 22, 2008, 424).  On that date, Hill transported Petitioner and Edwin Lockett from the Kalamazoo County Jail to the Kent County Jail regarding separate matters. (Tr. 424-25).  While within the Kent County Jail, Petitioner and Lockett were in separate rooms from which conversations from the other could not be heard.  (Tr. 425-26).

**Tod Neldon**

As of July 9, 2007, Neldon was employed as a forensic crime lab technician with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 22, 2008, 430-32).  Beginning on that date, Neldon began a forensic examination of the two vehicles involved in the shooting of Tim Palmer.  (Tr. 432-51).  As part of his investigation, Neldon retrieved latent fingerprints from Tyres Sykes' vehicle, specifically from the driver's side rear door handle and window.  (Tr. 435-40).  Neldon also attended the autopsy of Tim Palmer and collected and secured several items of evidence

10

recovered during the autopsy.  (Tr. 451-54).

## Gary Latham

As of July 2007, Latham was employed as a crime lab specialist with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 22, 2008, 460-61).  Latham participated in the processing of the two vehicles involved in the shooting of Tim Palmer.  (Tr. 461-62).  Latham discovered a bullet hole in the "rear part of the window frame" of the "passenger side front door" of the silver Grand Am.  (Tr. 462).  The bullet that killed Palmer entered the car at this point.  (Tr. 462-63).  Latham determined that the bullet in question was fired from a height of approximately 42 inches.  (Tr. 463).  Given this height, it was unlikely that the bullet in question was fired by someone from a standing position.  (Tr. 463-64).  However, an examination of Tyres Sykes' vehicle revealed that the "mid window" area of the back seat doors was 42 inches from the ground.  (Tr. 464-67).

## Jeff Crump

Crump testified that he was employed as a firearms examiner with the Michigan State Police.  (Trial Transcript, February 22, 2008, 472).  Crump was certified to testify as an expert in the areas of firearms and tool mark identification.  (Tr. 472-76).  Crump examined the two shell casings found near the crime scene and determined they were most likely fired from a .45 caliber weapon.  (Tr. 479-83).

**Brett Pittelkow**  (485-93

As of July 8, 2007, Pittelkow was employed as a Detective with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 22, 2008, 485).  On that date, Pittelkow spoke with Sarah Sykes and, two days later, spoke with her grandson, Tyres Sykes.  (Tr. 485-91).

**Michael Gonder**

As of July 11, 2007, Gonder was employed by the Kalamazoo Department of Public Safety helping to process arrestees.  (Trial Transcript, February 22, 2008, 495-96).  On that date, Gonder helped process Petitioner and, as part of this process, obtained Petitioner's fingerprints.  (Tr. 496).

**Edwin Lockett**

In July and August 2007, Lockett was housed in the Kalamazoo County Jail.  (Trial Transcript, February 26, 2008, 504).  During this time, Lockett was in the same cell as Petitioner and the two had frequent contact.  (Tr. 505-07).  Petitioner told Lockett that he was jail because he "shot the boy in the head."  (Tr. 505).  Specifically, Petitioner told Lockett that he shot the boy while riding in a vehicle following an incident that occurred earlier in the day at his house.  (Tr. 505).

**Greg Hatter**

As of July 8, 2007, Hatter was employed as a Detective with the Kalamazoo Department of Public Safety.  (Trial Transcript, February 26, 2008, 513).  Following the killing of Tim Palmer, Detective Hatter interviewed Elijah Roberson.  (Tr. 513).  Roberson told Hatter that he

witnessed Petitioner fire the shots that killed Tim Palmer.  (Tr. 513-16).

**Marty Johnson**

As of July 8, 2007, Johnson was employed as the Commanding Officer of the "joint city and county forensic laboratory."  (Trial Transcript, February 26, 2008, 519-20).  Johnson was certified to testify as an expert in the area of fingerprint analysis.  (Tr. 519-20).  Johnson testified that the latent fingerprints that were recovered from the driver's side rear door handle and window of Tyres Sykes' vehicle belonged to Petitioner.  (Trial Transcript, February 22, 2008, 435-40; Trial Transcript, February 26, 2008, 522-24).

**Joyce DeJong**

As of July 11, 2007, Dr. DeJong was employed as a forensic pathologist and consultant to the Kalamazoo County Medical Examiner.  (Trial Transcript, February 26, 2008, 527-29).  On that date, Dr. DeJong performed an autopsy on Tim Palmer.  (Tr. 529).  The doctor determined that Palmer died from a gunshot wound to the head.  (Tr. 538).

**Della Nichols**

Nichols testified on Petitioner's behalf.  As of July 8, 2007, Nichols resided across the street from Petitioner.  (Trial Transcript, February 26, 2008, 541-43).  Nichols arrived home that morning at approximately 1:40 a.m. at which point she observed an argument taking place outside of Petitioner's residence.  (Tr. 542-43).  Petitioner was yelling at the occupants of a silver vehicle to "get the hell from in front of his house."  (Tr. 543, 548).  Petitioner and one of the occupants of

the vehicle in question then began arguing. (Tr. 543-44). The vehicle in question began to drive away a short time later, but as it drove away somebody from inside the vehicle began firing a weapon. (Tr. 544-46). Immediately thereafter, Petitioner ran "behind some houses" while Tyres Sykes began firing his weapon in the direction of the departing vehicle. (Tr. 544-49). Nichols then observed two cars begin chasing the silver car, a maroon Oldsmobile and Tyres Sykes' vehicle. (Tr. 548-50).

**Rebecca Van Brocklin**

Van Brocklin testified as a rebuttal witness for the prosecution. As of July 8, 2007, Van Brocklin was employed as a Public Safety Officer for the Kalamazoo Department of Public Safety. (Trial Transcript, February 26, 2008, 564). Early that morning, Van Brocklin was dispatched to the 600 block of Ada Street. (Tr. 564-65). While in that particular area, Van Brocklin was approached by Della Nichols. (Tr. 565). When speaking with Van Brocklin, Nichols never mentioned gunfire emanating from the silver car or that a second car chased after the silver car. (Tr. 565-66). Nichols also never mentioned seeing Tyres Sykes with a gun. (Tr. 566). Van Brocklin searched the area around Petitioner's residence and discovered no evidence that any weapon had been fired. (Tr. 566).

Following the presentation of evidence, the jury found Petitioner guilty of second degree murder, assault with the intent to commit great bodily harm less than murder, and two counts of possessing a firearm during the commission of a felony. (Trial Transcript, February 29, 2008, 644-45). Petitioner was sentenced to serve 35-75 years on the murder conviction and lesser sentences on the other convictions. (Sentencing Transcript, March 24, 2008, 28-29). Petitioner

14

appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.      The trial court violated Mr. West's due process rights when it refused Defendant's request to discharge defense counsel after the attorney-client relationship had broken down.

II.     Defendant-Appellant did not receive the effective assistance of counsel where trial counsel failed to request jury instructions to support the defense.

III.    Defendant-Appellant was convicted in violation of his right to due process of law where there was insufficient evidence to prove his identity as the perpetrator of the murder, assault, and related firearms offenses.

IV.     Defendant-Appellant was denied a fair trial in violation of Const. Am. VI, where Defendant-Appellant's jury pool had only two (2) non-whites in the jury venire, thus excluding an ethnic group, which there is a large African-American community in Kalamazoo County.

V.      Defendant-Appellant was denied the effective assistance of counsel in violation of the Sixth Amendment as well as the Fourteenth Amendment.

VI.     Defendant-Appellant was denied a fair and impartial trial when the prosecutor was permitted to put the deceased's mother on the stand as a character witness, which defense counsel made only one (1) objection, thus rendering defense counsel ineffective, as this clearly was a violation of the Defendant-Appellant's right to a fair trial.

VII.    Defendant-Appellant was denied a fair and impartial trial when the prosecutor failed to endorse Andre Nelson as a witness, or to disclose to the defense that Mr. Nelson claimed to have killed Tim Palmer, this was evidence that could have made a difference in the outcome of the trial.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. West*, 2009 WL 2952571 (Mich. Ct. App., Sept. 15, 2009). Asserting the same issues, Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. West,* Case No. 139931, Order (Mich., Jan. 29, 2010). On December 29, 2010, Petitioner initiated the present action in which he asserts the following claims:

    I.    The state courts rendered an unreasonable determination of the facts presented, and violated Petitioner's 14th Amendment right to due process of law, when determining that Petitioner was not denied a fair and impartial trial, when the prosecutor was permitted to put the deceased's mother on the stand as a character witness.

    II.    The state courts ruled contrary to and unreasonably applied *Jackson v. Virginia*, and deprived Petitioner of his 14th Amendment right to due process of law, where his convictions were based on insufficient evidence to prove Petitioner's identity as the perpetrator of murder, assault, and related firearms offenses.

## STANDARD OF REVIEW

West's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

    (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

17

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly

established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).  This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."  *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

# ANALYSIS

## I.        Due Process

The first witness questioned by the prosecution was Thosha Suggs, Tim Palmer's mother.  After Suggs testified as to what she witnessed on the night her son was shot, the following exchange occurred between Suggs and the prosecutor:

| | |
|---|---|
| Prosecutor: | Now just introduce us a little bit to Tim.  What had happened recently in his life? |
| Defense: | Your Honor, I'm going to object.  I don't see the relevance of this testimony. |
| Prosecutor: | Well, I'm not going to get into a lot of detail.  I think out of fairness - we have a young man who's not here to testify for himself - a short introduction to him seems reasonable. |
| The Court: | Very brief.  I'll allow it.  Go ahead. |
| Prosecutor: | Had he just finished high school, can you tell us? |
| Suggs: | Had just graduated from high school.  Had received a paper - he was on his way to college for wrestling. |
| Prosecutor: | Go ahead. |
| Suggs: | He was doing wres - he had took wrestling six years in school from seventh grade to almost his 12th grade year.  He had been doing it the whole time and had a - so he just graduated for school, just doing really good. |
| Prosecutor: | All right.  Now you had - you moved to Benton Harbor, and he remained - Tim remained here? |
| Suggs: | Yes. |
| Prosecutor: | Okay.  And was that so he could finish high school? |
| Suggs: | So he could finish school with his - he stayed with his dad. |

| | |
|---|---|
| Prosecutor: | And he received some information about going to college? |
| Suggs: | Yes, he did. |
| Prosecutor: | For wrestling? |
| Defense: | Objection.  Hearsay. |
| Suggs: | Yes. |
| The Court: | I'll allow it, but let's move on. |

(Trial Transcript, February 21, 2008, 189-90).

Petitioner asserts that allowing Suggs to testify as a "character witness" in this manner violated his right to a fair trial.  Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.  *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

21

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted). Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence linking the defendant to the crime. *See Ege*, 485 F.3d at 374-78. However, where there exists sufficient other evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation. *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011). Thosha Suggs' testimony concerning her son was very brief and, at most, only peripheral to the case against Petitioner. The testimony by the various other witnesses was more than sufficient to establish Petitioner's guilt.

The Michigan Court of Appeals rejected Petitioner's claim that the admission of the testimony in question deprived him of the right to a fair trial:

> Defendant finally argues on appeal that the prosecutor permitted the victim's mother to testify concerning the victim's college plans, which constituted an impermissible appeal to sympathy in order to convince the jury to convict defendant. We review unpreserved claims of prosecutorial misconduct for plain error. The test for prosecutorial misconduct is whether, after examining the prosecutor's statements and actions in context, the defendant was denied a fair and impartial trial. Claims of prosecutorial misconduct are considered on a case-by-case basis, and the actions of the prosecutor are to be

22

considered as a whole and evaluated in light of the defense arguments and the evidence admitted at trial. The prosecution may not appeal to the jury's sense of sympathy for the victim. At trial, part of the defense theory was that earlier in the evening someone from inside the vehicle, in which the victim was an occupant, fired a gun at defendant's residence. The defense attempted to establish that the occupants in the victim's vehicle were traveling from place to place looking for trouble. The fact that the victim had recently graduated from high school and was preparing to enter college on a wrestling scholarship rebutted that assertion. The trial court determined that a brief background was relevant, and defendant does not challenge that ruling on appeal. The challenged testimony was derived from the first witness before a lengthy discussion of other evidence, it comprised only a brief part of the argument, and it was not so inflammatory that defendant was prejudiced.

*West*, 2009 WL 2952571 at *4 (internal citations omitted).

The decision by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

## II.        Sufficiency of the Evidence

Petitioner asserts that he is entitled to relief because the prosecution failed to present sufficient evidence to support his convictions for second degree murder, assault with the intent to commit great bodily harm less than murder, and two counts of possessing a firearm during the commission of a felony. Specifically, Petitioner argues that "his convictions were based on insufficient evidence to prove [his] identity as the perpetrator of murder, assault, and related firearms offenses."

Claims challenging the sufficiency of the evidence are governed by the standard

23

articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect at the time of Tim Palmer's murder, an individual was guilty of second degree murder if the following elements were satisfied: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996) (citing *People v. Dykhouse*, 345 N.W.2d 150 (Mich. 1984)). Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989). Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327

(Mich. 1980).

A person was guilty of assault with the intent to do great bodily harm less than murder if the following elements were satisfied: (1) an assault; and (2) a specific intent to do great bodily harm less than murder. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996). Finally, a person was guilty of possessing a firearm during the commission of a felony if he: (1) committed, or attempted to commit, a felony; and (2) possessed a firearm during such commission or attempt. *See People v. Davis*, 549 N.W.2d 1, 4 (Mich. Ct. App. 1996).

As discussed above, the prosecution presented sufficient evidence that Petitioner murdered Tim Palmer, assaulted one or more of the other occupants of the vehicle in which Palmer was riding, and committed both offenses while possessing a firearm. Briefly, the evidence revealed the following. Shortly before Palmer's killing, Petitioner had an altercation with Steven Whyte who arrived at Petitioner's residence in a silver Grand Am in which Tim Palmer was riding. During this altercation, Petitioner brandished a weapon and threatened to kill Whyte. Before Petitioner could carry out his threat, however, Whyte departed in the Grand Am. Petitioner, Tyres Sykes, and Elijah Roberson immediately gave chase to Whyte and his companions. Soon thereafter, Sykes encountered the Grand Am in which Whyte, Palmer, and three others were riding, at which point Petitioner fired several shots, killing Tim Palmer and injuring Anthony Morgan. This evidence is more than sufficient to satisfy the elements of all the crimes of which Petitioner was convicted. More specifically, this evidence is more than sufficient to establish that Petitioner was the individual who committed the crimes in question. The Michigan Court of Appeals rejected Petitioner's insufficiency of the evidence claim, concluding as follows:

Defendant next argues that the prosecutor presented insufficient

evidence to support the jury's verdict. This Court reviews sufficiency of the evidence claims de novo. The evidence is viewed "in a light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." Defendant does not dispute that all of the elements of second-degree murder and assault with intent to do great bodily harm were present; rather, he maintains that he was not at the crime scene and was not the one who shot the gun. Identity is always an essential element of any crime.

Considering the evidence in a light most favorable to the prosecution, there was sufficient evidence beyond a reasonable doubt that defendant was at the crime scene and shot the victim. Defendant had a motive, and shortly before the shooting defendant, Tyres Sykes, and Elijah Roberson got into an argument with the occupants of the Grand Am in which the victim was riding. During the argument, defendant produced a black handgun and threatened to shoot the Grand Am's occupants. Roberson testified that as the Grand Am was driving away, some of the occupants of the car fired shots toward defendant's house. Defendant, Sykes, and Roberson then drove in Syke's station wagon in search for the Grand Am. Defendant was in the back seat. Roberson testified that when they found the Grand Am, he heard two or three gunshots coming from the back of Sykes' station wagon, where he observed defendant holding a black handgun. The surviving occupants of the Grand Am confirmed that the gunshots came from the backseat of Sykes station wagon. Furthermore, while in jail awaiting trial, defendant told two of his cellmates that he shot the victim. This evidence was sufficient to support a finding beyond a reasonable doubt that defendant shot the victim.

*West*, 2009 WL 2952571 at *1-2 (internal citations omitted).

The decision by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that West's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  November 19, 2012                           /s/ Ellen S. Carmody
                                                   ELLEN S. CARMODY
                                                   United States Magistrate Judge

27